Argued and submitted September 25, reversed and remanded with instructions
October 30, 1991, reconsideration denied March 18, petition for review denied
April 28, 1992 (313 Or 209)

Samuel E. ALLEN,
individually and dba Monarch Motor Hotel,
*Appellant,*

*v.*

Edward MEINIG,
Michael Meinig, Meinig Brothers, Inc.,
and Tri-Star Western, Inc.,
*Respondents,*

*and*

MEINIG OIL COMPANY,
*Respondent.*

(A8903-01517; CA A65441)

819 P2d 744

Gary M. Georgeff, Portland, argued the cause for appellant. With him on the briefs was O'Donnell, Ramis, Crew & Corrigan, Portland.

Kurt L. Maul, Portland, argued the cause for respondents Edward Meinig, Michael Meinig, Meinig Brothers, Inc. and Tri-Star Western, Inc. With him on the brief was Hampson, Bayless, Murphy & Stiner, Portland.

No appearance for Meinig Oil Company.

Before Richardson, Presiding Judge, and Joseph, Chief Judge, and Deits, Judge.

JOSEPH, C. J.

## JOSEPH, C. J.

Plaintiff is a judgment creditor of Meinig Brothers, Inc. (the corporation), and brings this action on a creditor's bill and for other relief. While the action that would result in plaintiff's obtaining the judgment was pending, defendants Michael and Ed Meinig, who are brothers, decided to stop doing business through the corporation and to form defendant Tri-Star Western, Inc. (Tri-Star). Tri-Star then began engaging in essentially the same heating, ventilating and air conditioning business that the corporation had performed; it also used the same business location, phone number, equipment and inventory as had the corporation. The only shareholders of Tri-Star were the Meinig brothers. Much of the business property used by the two entities was leased from defendant MEC Leasing (MEC), a partnership that also consists of the two brothers.

During the course of "restructuring" their business activities, the brothers caused the corporation to convey approximately $6,800 worth of inventory to its attorneys as a credit against its unpaid bill. The attorneys in turn transferred the inventory to Tri-Star, in exchange for a promissory note. In addition, Michael and Ed, as the corporation's directors, passed a resolution that had the effect of forgiving a debt of approximately $60,500 that MEC owed the corporation. In exchange, the brothers agreed that they would pay debts that slightly exceeded that amount, in the aggregate, that the corporation owed the brothers' father and aunt. For all practical purposes, the corporation was left without any significant assets and is defunct.

Although plaintiff divided his complaint into several separately stated claims, what he really advances are a number of alternative theories for reaching the transferred assets and obtaining payment of his judgment. He argues, first, that Tri-Star is responsible for the corporation's debts, because it is simply a "continuation" of the corporation, and that Tri-Star is also accountable for the $6,800 in inventory, because it was fraudulently transferred within the meaning of ORS 95.200 et seq. Plaintiff also contends that the Meinig brothers personally and MEC are accountable for the amount owed him, because the forgiveness of their debt to the corporation was also a fraudulent transfer and because the

brothers "were alter egos of [the corporation] and are personally liable for its debts."

Defendants respond that all of the activities were undertaken for legitimate business reasons. The fact that the lawyers, the father and the aunt were paid and plaintiff was not, according to defendants, was simply an exercise of their right to prefer some creditors over others, which is permissible in the absence of fraud. The case was tried to the court, which found for defendants. Plaintiff appeals, and we reverse.

■ ■ Plaintiff first contends that some of his claims sounded in law and that he was entitled to a jury trial on them. We disagree. The essential relief that plaintiff seeks is to set transfers aside and to make assets available to satisfy his claim. That is an equitable remedy. *See* ORS 95.260; *Nelson v. Hansen,* 278 Or 571, 565 P2d 727 (1977). The fact that plaintiff also sought money damages and placed legal labels on claims that, in substance, were redundant of the equitable claims, does not change the real nature of the proceeding. Any monetary remedy to which he may be entitled simply follows from or is ancillary to the underlying equitable remedy. *See Wincer v. Ind. Paper Stock Co.,* 48 Or App 859, 618 P2d 15 (1980). It follows, of course, that we try the facts *de novo* on appeal. We make findings that are very different from those of the trial court.

■ Plaintiff relies, for his claim against Tri-Star, on *Erickson v. Grand Ronde Lbr. Co.,* 162 Or 556, 568, 92 P2d 170, 94 P2d 139 (1939). There, the court noted that a successor corporation is not usually liable for its predecessor's debts, but is liable in circumstances "where the purchasing corporation is merely a continuation of the selling corporation" or "where the transaction is entered into fraudulently in order to escape liability for such debts." Defendants argue that Tri-Star does not come within either exception. They maintain that there are significant differences between the businesses and the organization of the corporation and Tri-Star. Therefore, Tri-Star was not a mere continuation of the corporation. We need not decide that facet of the argument, because it is enough under the *Erickson* rationale if Tri-Star was formed for the purpose of defrauding creditors and to escape liability.

Defendants argue that Tri-Star was not formed to escape the corporation's potential liability to plaintiff. Rather, they say:

"[The corporation] had a number of other problems, including a lawsuit filed [by] a former employee and a large debt to an electrical supplier. However, the major factor in the decision to cease operating business concerned problems with a key employee, Rick Davison."

They go on to explain that Davison was a problem while employed by the corporation and that, when he resigned, the corporation had "no employees who possessed the requisite electrical supervisor's license." They also maintain that they thought that they would win the underlying action against plaintiff.

Those explanations are wholly unconvincing. The resignation of a key employee would more naturally lead to the hiring of a replacement than the dissolution of a corporation and the creation of a new one that engages in substantially the same kind of business.

Still less imposing are defendants' protestations that the corporation was disassembled and Tri-Star created because of the potential or actual debts owed the former employee and the supplier rather than the obligation owed plaintiff. Even if it were necessary for defendants to have had the specific intent to defraud *only* plaintiff in order for them to come within the *Erickson* exception, their testimony that they were attempting to escape liability to two other creditors hardly helps them. An obvious inference follows that their intention extended to plaintiff. Moreover, it is not plausible that defendants would take an action that, if successful, would relieve them from all debts that they chose not to pay but that they were motivated to do so only to avoid some of those debts.

We find from our review of the evidence, including defendants' own, that Tri-Star was formed to defraud creditors of the corporation and to avoid its debts to plaintiff and other creditors. To the extent that it is relevant, we also reject defendants' argument that Tri-Star did not succeed to assets of the corporation, and we find the opposite to be the fact. We

conclude that Tri-Star is responsible for the corporation's debt to plaintiff.

Plaintiff's principal claim against the other defendants[1] turns on the fraudulent transfer provisions of ORS chapter 95. ORS 95.230(1)(a) provides:

"A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

"(a) With actual intent to hinder, delay, or defraud any creditor of the debtor * * *."

In *Bivens v. Hancock,* 71 Or App 273, 279, 692 P2d 153 (1984), we said, in applying *former* ORS 95.070, the predecessor of the quoted statute:

"[W]hen a transfer by a debtor in preference of creditors is made under circumstances involving so-called 'badges of fraud,' the burden is on the transferee to demonstrate that the transfer was not fraudulent by proof that it was not made with an intent to defraud other creditors, that the consideration was fair and adequate and that no benefit was secured or reserved to the grantor."

■ Plaintiff contends that many "badges of fraud," as defined in ORS 95.230(2), surrounded the transaction whereby the corporation forgave MEC's debt to it and the Meinig brothers in turn paid the corporation's debts to their two relatives. Plaintiff argues that defendants did not carry their burden of showing the absence of an actual intent to defraud creditors. Defendants agree that there were "badges of fraud," as do we.[2] They argue, however, that there was no evidence of actual intent to defraud and that the fact that their accountant rather than they proposed and structured the transaction shows the absence of that intent. Acting on professional advice, in itself, is not dispositive on the question of motives or intent. There was ample evidence that the whole course of events was orchestrated by the brothers to strip the

---

[1] No specific claim is urged against Meinig Oil Company, at least on appeal, and we do not refer to it.

[2] "Scarlet letter" would be a more accurate characterization than "badges" on these facts.

corporation of anything with which to pay its creditors. We find that the purpose of the transaction was to prevent money from passing through the corporation's treasury and to eliminate the receivable as an asset. Defendants come nowhere close to establishing the absence of an intent to defraud.

■  Our disposition of the issues that we have already discussed provides plaintiff with relief against all defendants from whom he seeks it and makes discussion of his alternative theories unnecessary.[3] With two exceptions, it is also unnecessary to discuss defendants' remaining arguments. The first exception is their contention that the attorneys and the father and aunt who received payments were the transferees of the challenged conveyances, were necessary parties and had to have been joined. The initial premises of that contention are mistaken. The inventory is in the hands of Tri-Star, and plaintiff was not required to join the lawyers for their role in its transfer in order to obtain recourse to it. With respect to the father and aunt, defendants misperceive what the corporation fraudulently transferred. It was not the brothers' payment to the relatives but the corporation's forgiveness of MEC's debt that comes under ORS chapter 95. The recipients of that transfer were the brothers and their partnership.

■  Defendants also argue that, although our review is *de novo,* the factual issues in this case turn on the credibility of the witnesses and we should defer to the trial court's presumptive belief in the defendants' testimony. Generally, we give considerable weight to the credibility determinations of trial judges. However, that is not an immutable rule. As Judge Richardson said in his separate opinion in *Lewis and Clark College v. Bureau of Labor,* 43 Or App 245, 256, 602 P2d 1161 (1979), *rev den* 288 Or 667 (1980):

> "[C]redibility (more properly weight) is determinable from a number of factors other than witness demeanor. The credibility, *i.e.,* weight, that attaches to testimony can be determined in terms of the inherent probability, or improbability of the testimony, the possible internal inconsistencies, the fact it is or is not corroborated, that it is contradicted by other

---

[3] The brothers, as partners of MEC, are responsible for its debts and liabilities. The amount of the forgiven debt exceeds the amount of plaintiff's judgment.

testimony or evidence and finally that human experience demonstrates it is logically incredible.''

Defendants' evidence here does not stand up under those measurements, and it makes no difference how well their witnesses may have deported themselves in presenting it.[4]

Reversed and remanded with instructions to enter a judgment for plaintiff not inconsistent with this opinion.

---

[4] The trial court was heavily influenced by the fact that there was adequate consideration for both transfers. *See* ORS 95.230(1)(b). However, under ORS 95.230(1)(a), actual intent to defraud is an independent basis for holding a transfer fraudulent.